Filed 11/8/23  P. v. Jacinto CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ORACIO ALVAREZ JACINTO,<br><br>Defendant and Appellant. | F085276<br><br>(Fresno Super. Ct. No. F22901627)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan M. Skiles, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Jessica A. Perkins, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On October 12, 2022, defendant Oracio Alvarez Jacinto was convicted by a jury of second degree robbery, possession of a firearm by a felon, and evading an officer with willful, wanton disregard for safety. On appeal, defendant argues that his trial counsel provided ineffective assistance by failing to object to a police officer's testimony that defendant committed the robbery. Defendant further argues that, given the weak circumstantial and eyewitness identification that was used to convict him, this error requires reversal of defendant's convictions. The People disagree. We affirm.

## **PROCEDURAL HISTORY**

On August 12, 2022, the Fresno County District Attorney filed a second amended information charging defendant with second degree robbery (Pen. Code, § 211;[1] count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and evading an officer with willful, wanton disregard for safety (Veh. Code, § 2800.2, subd. (a); count 3).

As to count 1, the information alleged that defendant personally used a firearm (§ 12022.53, subd. (b)). The information further alleged that defendant suffered two prior "strike" convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On August 19, 2022, defendant was found guilty by a jury on all counts. As to count one, the jury found true that defendant used a firearm during the commission of the offense. On August 22, 2022, the trial court found that defendant had two strike priors.

On October 20, 2022, the trial court denied defendant's request to strike two of his prior convictions and all enhancements for sentencing purposes. The court imposed an aggregate term of 14 years plus 25 years to life.[2] As to count 1, defendant was sentenced

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

[2] The minute order memorializing the imposition of defendant's sentence contains errors. It states that defendant was sentenced to a determinate term of four years instead of 14 years, and it states that the 10-year sentence for the firearm enhancement runs concurrently with the sentence on count 1. However, according to the oral

to 25 years to life, plus a 10-year firearm enhancement; as to count 2, defendant was sentenced to four years (the middle term of two years, doubled due to the prior strike conviction), stayed pursuant to section 654; and as to count 3, defendant was sentenced to four years (the middle term of two years, doubled due to the prior strike conviction), to be served consecutively to the 25-year-to-life sentence on count 1.

On November 8, 2022, defendant filed a notice of appeal.

## FACTUAL SUMMARY

**A.C.'s Testimony**

A.C. was an employee at a convenience store. A.C. worked the night shift as a cashier. At approximately 12:00 a.m. on March 12, 2022, A.C. was working. A man walked into the store. The man was wearing jeans, a red jersey, and a beanie or hat. He

---

pronouncement, defendant was sentenced to an aggregate determinate term of 14 years, followed by an indeterminant term of 25 years to life. (See also § 12022.53, subd. (b) ["Notwithstanding any other law, a person who, in the commission of a felony specified in [section 12022.53] subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years."].)

The abstract of judgment also contains errors. At sentencing, the trial court erroneously stated that the sentence on count 3 was one-third the middle term. The trial court did not impose one-third the middle term – one year four months – and it would have been error to do so given that defendant was sentenced to an indeterminate term on count 1. (§ 667, subd. (e)(2)(A)(ii); § 1170.1; *People v. Neely* (2009) 176 Cal.App.4th 787, 798 ["Once the court determines what sentence is to be imposed for the indeterminate term offenses and the determinate term offenses, it combines the two to reach an aggregate total sentence. Nothing in the sentencing for the determinate term crimes is affected by the sentence for the indeterminate term crime."].) The abstract of judgment correctly reflects that defendant was sentenced to double the middle term, but also reflects the trial court's erroneous statement that defendant was sentenced to one-third the middle term. Additionally, the abstract spells defendant's middle name "Alvez" instead of "Alvarez."

When a discrepancy exists between a trial court's oral pronouncement and the minute order or abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We may correct a clerical error in recording a lower court's pronouncement. (*Ibid.*) We will therefore order that the errors in the minute order and the error in the abstract of judgment be corrected.

3.

was approximately five feet four inches to five feet five inches tall. No one else was in the store. A.C. walked behind the register, and the man asked for two packs of cigarettes.

A.C. turned around to grab the cigarettes and rang them up. When she looked up from the register, the man had a gun pointed at her. The gun was a gray or silver revolver.

A.C. was scared for her life. However, she remained calm and did everything the man asked. She gave the man all the bills in the cash register, which totaled approximately $200. After she gave him the money, the man asked A.C. for her smart watch. She gave it to him. A.C. was scared when the man asked for her watch. The man then asked for her purse, but she told him that she does not carry a purse.

After that the man stood there for a few seconds, so A.C. asked if he wanted the coins as well. At that point the man left the store. He took both packs of cigarettes with him. The man got into a brown or tan car and drove away.

After the man left, A.C. called 911. A recording of the 911 call was played for the jury. Law enforcement arrived within 10 minutes of the call.

A.C. was able to track the location of her smart watch. The final location was at a house in southeast Fresno. A.C. did not recall the exact address, but she did provide it to law enforcement. Law enforcement was also looking at her phone, which was tracking the watch. They were able to see the exact address. A.C. was also able to tell law enforcement the exact amount of money that she gave the man. A.C. also told law enforcement that the man had a mustache.

There were cameras at the convenience store. On the same day as the robbery, A.C. watched surveillance videos from several of the cameras. There were cameras outside the store as well, and A.C. watched the video showing the vehicle the man got in when he left the store. Portions of the surveillance videos were played for the jury, and they were shown photographs from the surveillance cameras.

A beanie and a red jersey were shown to A.C., and A.C. identified them as being the beanie and jersey the man wore on March 12, 2022. The beanie and jersey were also shown to the jury. The jury was also shown the firearm, as well as photographs of the firearm.

A.C. was not able to identify the man who pointed the gun at her during an infield lineup on the date of the robbery. However, during trial, A.C. was able to do so, and identified defendant. There was "no doubt" in A.C.'s mind that defendant was the man who pointed the gun at her.

**Officer Kelly's and Officer Voerman's Testimony**

On March 12, 2022, Caleb Kelly and Sarah Voerman were police officers with the City of Fresno. Officers Kelly and Voerman were on duty on March 12, 2022, at around 12:13 a.m. They responded to assist a different unit regarding the incident at the convenience store. They separately drove to the house in southeast Fresno where the smart watch was located, but they arrived at approximately the same time.

As they arrived, they saw a man (later identified as Robert Jacinto[3]) walking away from the house. Officer Kelly testified that Robert matched the description he was provided. He was a Hispanic male with a mustache, long hair, and dark clothing.

As Officers Kelly and Voerman got closer to Robert, Robert ran. Kelly and Voerman gave chase. Kelly and Voerman caught Robert, but Robert refused to roll over on to his stomach and put his hands behind his back.

Someone else arrived, and Officer Kelly told that person to back away. That person eventually left, and Kelly did not have an opportunity to speak with him.

Eventually other units arrived, and Robert was tased. He was placed in handcuffs and identified as Robert. Because Robert was tased, emergency medical services (EMS) personnel were called. Officer Voerman's sergeant and EMS personnel put Robert onto a

---

[3] As defendant and Robert Jacinto share a last name, we refer to Robert by his first name.

5.

gurney, and he was sent to the hospital in downtown Fresno. After Robert was brought to the hospital and EMS personnel brought the gurney back to the ambulance, they searched the gurney and found a gun.

Officer Voerman was shown photographs of Robert that were taken that night. Robert was not wearing a red jersey or a beanie in the photographs, and Voerman never saw him wearing either a red jersey or a beanie. In one of the photographs, Robert had long hair that was in a ponytail and a goatee.

**Officer Elms's Testimony**

On March 12, 2022, Matthew Elms was a police officer with the City of Fresno. He was on duty on March 12, 2022, at about 12:22 a.m. Stolen property was being tracked, and the southwest policing district asked the southeast policing district for assistance.

Officer Elms was advised that stolen property was tracking to the house in southeast Fresno. Additionally, other officers had arrived on scene, and it sounded like they were in a foot pursuit. So, Elms (who was driving) and his partner (Officer Rodarte) went to the house to assist. They were in a marked patrol vehicle that had a siren, as well as red and blue lights on top. They were wearing their Fresno City Police Department uniforms.

As Officers Elms and Rodarte headed to the house with their lights and siren on, "Air 1" advised that a four-door silver sedan left from that address. Elms saw the vehicle and attempted to catch up. The lights and siren were on. Elms wanted to catch up to the vehicle because, given the reports of the armed robbery and stolen property being at the address, Elms believed it was possible the suspect was attempting to flee.

The vehicle Officer Elms was chasing appeared to be driving at a high rate of speed, and over the 25 mile per hour speed limit. Additionally, the vehicle ran a stop sign and a red light.

6.

Officers Elms and Rodarte continued to follow the vehicle until the helicopter started giving updates. At that point Elms shut down the emergency equipment and just followed the vehicle's path. The "stop [*sic*]" speed Elms drove at while chasing the vehicle was approximately 50 miles per hour. Elms and Rodarte had attempted to catch up to the vehicle for less than a minute. During this time, the vehicle never attempted to stop or pull over, even though Elms's vehicle was clearly visible.

Eventually, Air 1 advised that the vehicle had crashed at an intersection approximately five miles south of the house. It took Officer Elms approximately one minute to arrive at the scene, driving at approximately 90 miles per hour.

Officers Elms and Rodarte were advised that someone had left the vehicle and began running, so they passed the scene of the accident and continued driving to cut the individual off. They eventually got the individual to stop running by holding him at gunpoint and ordering him to lie on the ground. Elms identified defendant as the individual who ran from the vehicle.

Defendant was eventually placed into handcuffs, and Officer Elms searched him. Elms found money, a pack of cigarettes, and a wallet. At the time, defendant was wearing black jeans and a black or grey tank top.

The jury was shown photographs of the $76 and the pack of cigarettes (of the same brand taken from the convenience store) that Officer Elms found on defendant. The pack of cigarettes still had plastic on, and no cigarettes were missing from the pack. The jury was also shown photographs of the black jeans, black tank top, and brown shoes that Elms recognized as what defendant was wearing on the night of the robbery.

When Officer Elms arrested defendant, he did not see a red jersey, but he did find a black beanie in the road by the silver four-door sedan that had crashed.

**Officer Jacobo's Testimony**

On March 12, 2022, Derek Jacobo was a police officer with the City of Fresno. He was assigned to the Fresno Police Department air support unit as a technical flight

officer. He was on duty on March 12, 2022, at about 12:15 a.m. Officer Jacobo was dispatched to assist in an armed robbery investigation. He was with his supervisor, and he was not the one flying the helicopter.

There was a radio broadcast that a smart watch related to the investigation was being tracked to the house in southeast Fresno. The helicopter flew above the house at approximately 700 feet above ground level.

After the helicopter arrived, they began searching the area. Officer Jacobo saw an individual on the northwest corner of the intersection east of the house, walking away from the house. This was the only person that Jacobo saw. Jacobo illuminated the subject with the searchlight. The person was wearing dark clothing. As the clothing did not match the description Jacobo was given of the suspect, and because two patrol units were headed towards the person, Jacobo continued searching the area.

Officer Jacobo shined the searchlight at the house, and he noticed another individual. This individual appeared to be in the driveway of the house and was wearing a red top.

At that time, Officer Jacobo was informed that there might have been a foot chase, so Jacobo began checking for those officers. He requested that units respond. As this was occurring, he observed a silver vehicle that was parked near the house. The vehicle began traveling east. Jacobo did not see any other cars traveling in this general area. Jacobo updated ground units and dispatch of his observations.

At first, the vehicle was traveling at a reasonable speed for a residential area. However, as Officer Jacobo observed it traveling south, it was driving at a higher rate of speed. Jacobo learned from a radio broadcast that the vehicle was fleeing from ground units. Within 10 to 30 seconds, the helicopter caught up to the silver car and the pursuing ground units.

The vehicle ran more than one red light. Additionally, it appeared to pass another vehicle in the shoulder, which was not a lane for vehicle movement.

The vehicle was unable to navigate a turn at an intersection and crashed. The crash occurred approximately two to three minutes after Officer Jacobo was informed that ground units were pursuing the vehicle. After the vehicle crashed, the driver exited the vehicle and began running east. The driver was not wearing a red shirt. The driver continued running until he was detained by ground units.

**Sergeant Knapp's Testimony**

On March 12, 2022, Joshua Knapp was a sergeant with the Fresno City Police Department. He was not on duty on March 12, 2022, at about 1:35 a.m., but as the supervisor of the robbery unit, he was called any time there was an armed robbery. Because it was a busy week, Knapp took the primary role on the convenience store robbery investigation.

Detective Olivera called Sergeant Knapp, briefed him on the investigation, and sent him a photograph of the suspect that was taken from the surveillance video. In the photograph, the suspect had tattoos. On his left wrist, there was a "sun looking type or a flower looking type design … and then writing across the top of the left hand." On his right forearm, "there is some additional writing." With the zoom feature provided by the police department, he was able to see the tattoos in better quality than the photograph shown to the jury.

After seeing the photograph, Sergeant Knapp and Detective Carr went to the intersection where the vehicle crashed. Knapp saw and photographed the vehicle. The vehicle was a silver four-door sedan. A short distance from the vehicle, there was a black beanie in the roadway that appeared to match the beanie the suspect was wearing in the photograph. The jury was shown photographs of the vehicle at the crash site and of where the beanie was found.

After investigating the area of the collision, Sergeant Knapp went to speak with defendant, who was in the back of a patrol vehicle. Knapp recognized him as the individual in the photograph that Detective Olivera sent. Knapp based this conclusion on

9.

defendant's facial features, the dark colored jeans defendant was wearing, and defendant's tattoos.

Sergeant Knapp also got a closer look at defendant's tattoos later at the hospital. He was able to examine them from six inches away. He also took photographs of the tattoos, which were shown to the jury. The photographs showed a tattoo of writing on defendant's right forearm that goes from the elbow towards the wrist; filler tattoos along the writing on the right forearm; a flower-type shape along the bottom of the wrist; additional tattoos on the web of the right hand; a tattoo of rays of the sun rising or flower tips coming up along the left wrist; and a tattoo of writing across the top of the left hand. At the request of the prosecutor, defendant showed the jury the tattoos on his arms.

Sergeant Knapp also noted that defendant has a prominent nose that was visible in the photographs he took as well as the photograph from the surveillance video.

Before going to the hospital, Sergeant Knapp went to the house in southeast Fresno. He looked around the area and located a red jersey to the east of the driveway. The jury was shown photographs of the red jersey and where it was located. It was a red college jersey with a "20" on it.

Additionally, the firearm found on the ambulance gurney at the hospital was the firearm that was used in the robbery.

Defendant and Robert are brothers. The house in southeast Fresno was where Robert lived. Sergeant Knapp saw defendant and Robert on March 12, 2022. Robert was wearing a black long-sleeve shirt with white writing, and he had long hair that was pulled back into a ponytail. Defendant's head was completely shaven, and defendant had less facial hair than Robert.

Surveillance video footage from the convenience store was played for the jury and paused at 18 seconds. Sergeant Knapp described that "[i]n this section here, this exact photograph, you can see [defendant's] facial feature. You can see his nose, his eyes, you can see his face. And when its clearer and closer, you get a better accurate representation

10.

of him." Knapp also stated that "[t]he black beanie that's on top of [defendant's] head, that appears to be the same black beanie that … we located in the roadway. The [red college] jersey with the Number 20 on it, it appears to be the same exact jersey that we located in the driveway in front of [the house in southeast Fresno] where the watch [w]as pinging at." Finally, Knapp stated that "in the [exterior surveillance video from the convenience store] you will see a silver [sedan] drive from left to right across the screen. And it appears to be the same vehicle that was located crashed [approximately five miles south of the house]." The jury was shown a photograph of the vehicle taken from this surveillance video.

When Sergeant Knapp was asked why he believed that defendant committed the robbery, Knapp stated: "I saw [defendant] in the video. There is surveillance video of him going into the store, of him robbing the store. The video that you can see here is not as clear as what we were able to see. We have different programs that we can slow it down, zoom it in and so forth. Locating all of the evidence, seeing him personally and seeing the surveillance video, after doing this for 17 years and spending six years as an investigator myself in violent crimes, it was based on the totality of the circumstances I believe it was him that committed the robbery." Robert was not the one who committed the robbery.

## DISCUSSION

Defendant argues that defense counsel provided ineffective assistance by failing to object to Sergeant Knapp's testimony that defendant committed the robbery. Specifically, defendant argues that Knapp testified as an expert, even though the prosecution did not expressly qualify him as one. Additionally, Knapp's opinion that defendant committed the robbery was inadmissible, whether it was lay or expert testimony, because the jury was competent to determine whether defendant committed the robbery. However, defense counsel failed to object to this testimony, and there was no rational tactical reason for this failure. Given the weak circumstantial and eyewitness

11.

identification evidence that was used to convict defendant, as well as the trial court's erroneous instruction directing the jury to consider how certain A.C. was in her identification of defendant, defense counsel's failure to object to Knapp's testimony was prejudicial.

We find that defendant fails to show that defense counsel's performance fell below an objective standard of reasonableness. Moreover, even if it did, defendant fails to show that, but for defense counsel's error, a different result would have been reasonably probable.

## I.     Standard of Review

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland*, *supra*, 466 U.S. at p. 689.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel

had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

## II. Analysis

### A. *Defense Counsel's Performance Did Not Fall Below an Objective Standard of Reasonableness*

We first addresses defendant's argument that defense counsel's failure to object to Sergeant Knapp's testimony that defendant committed the robbery fell below an objective standard of reasonableness.

" ' "[A]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" [citation].' " (*People v. Gurule* (2002) 28 Cal.4th 557, 609–610.)  This is not one of the rare cases.

Defendant objects to the following testimony from Sergeant Knapp:

> "Q     And after observing the surveillance photograph and observing the clothing, what, if anything, were you able to conclude from that?
>
> "A     Well after observing the surveillance photograph, after seeing Oracio Jacinto on scene, locating the beanie, locating the jersey, based on the totality of the circumstances and the evidence, I believe that Oracio Jacinto was the one that committed the armed robbery.
>
> "Q     Why?
>
> "A     For everything I just described.  I saw him in the video. There is surveillance video of him going into the store, of him robbing the store.  The video that you can see here is not as clear as what we were able to see.  We have different programs that we can slow it down, zoom it in and so forth.  Locating all of the evidence, seeing him personally and seeing the surveillance video, after doing this for 17 years and spending six years as an investigator myself in violent crimes, it was based on the totality of the circumstances I believe it was him that committed the robbery."

In support of his argument that defense counsel should have objected to this testimony, defendant relies on *People v. Torres* (1995) 33 Cal.App.4th 37 (*Torres*). In *Torres*, the defendant was convicted of first degree murder with a robbery special circumstance. (*Id.* at p. 43). The defendant collected money from drug dealers in return for the privilege of selling drugs in a particular area. (*Id.* at p. 42.) At trial, a police officer testified to the legal meaning of the terms "robbery" and "extortion," and to his opinion that the crimes committed were robberies. (*Id.* at p. 44.) The *Torres* court held the expert's testimony was improper because a witness may not express an opinion as to a defendant's guilt or innocence, or with respect to whether a crime has been committed. (*Id.* at pp. 46–48.) The *Torres* court found that defense counsel's failure to object to the expert's opinion constituted ineffective assistance because "[w]hether [the victim] was killed in the course of an attempted robbery or an attempted extortion was a crucial issue in this case. A killing in the course of an attempted robbery would constitute a special circumstance and would also support a first degree felony-murder verdict, a killing in the course of an attempted extortion would not support either." (*Id.* at p. 49.)

It is true that, similar to the officer in *Torres*, Sergeant Knapp testified that defendant committed robbery. Thus, defendant is correct that, whether lay or expert, pursuant to the holding in *Torres*, testimony that defendant committed robbery would generally be inadmissible. However, defendant is incorrect that there was no rational tactical purpose for failing to object in this case.

In *Torres*, whether the victim was killed during a robbery was a "crucial issue," and it was thus ineffective assistance to fail to object. (*Torres*, *supra*, 33 Cal.App.4th at p. 49.) In contrast, defense counsel in the present case admitted that a robbery occurred. In his opening statement, he stated, "[t]his is one of the rare cases where the District Attorney and I agree. There was a robbery. And we actually agree on the property taken. We just disagree on who committed the robbery." In closing, defense counsel stated, "This is one of the weird cases where we kind of agree. As we saw in the picture there is

14.

a robbery. We just don't know by whom." Thus, instead of challenging whether a robbery occurred, defense counsel attempted to cast doubt as to the identity of the perpetrator. Unlike in *Torres*, the crucial issue is the identity of the perpetrator, not whether a robbery occurred.[4]

Given the evidence in this case, particularly the surveillance video showing a man entering a store, pointing a firearm in the direction of A.C., and taking money as well as A.C.'s smart watch, the record discloses a rational tactical purpose to admitting the perpetrator committed robbery and instead challenging the perpetrator's identity. (See, e.g., *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060 ["The record reflects counsel made a tactical decision to concede that whoever committed these crimes was guilty of … first degree murder …."]; *People v. Freeman* (1994) 8 Cal.4th 450, 498 ["Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt."].) And given defense counsel's legitimate strategy of admitting that the perpetrator committed robbery, there was no reason to object to Sergeant Knapp's conclusion that the perpetrator (identified by Knapp as defendant) committed robbery. In fact, doing so may have undermined his credibility before the jury. Accordingly, this claim of ineffective assistance of counsel fails.

Defendant also appears to claim that defense counsel should have objected to Sergeant Knapp identifying defendant as the man in the surveillance video. This claim also fails.

A review of the record shows that much of Sergeant Knapp's testimony was introduced to show that defendant was the man in the surveillance video, and this testimony was based on his personal knowledge. Knapp reviewed a photograph taken from the surveillance video that showed a frontal view of the perpetrator. "He had a

---

[4] As discussed below, the identity of an individual in a surveillance video is a proper subject of nonexpert opinion.

15.

beanie on, a mask pulled down around his chin, a red [college] jersey, black pants."
Knapp also viewed defendant on the day of the robbery. Knapp testified that he
recognized defendant as the man from the photograph based on his facial features,
tattoos, and dark colored jeans. Knapp also saw Robert on the day of the robbery, and
Robert was not the man in the photograph. Robert and defendant looked "distinctly
different." Additionally, Knapp saw a beanie near the scene of the crash, and it appeared
to match the beanie Knapp saw the perpetrator wearing. The car that crashed also
appeared to be the same vehicle that was seen in the surveillance video. Knapp also went
to the house in southeast Fresno and viewed the red jersey, which matched the jersey that
the perpetrator was wearing in the surveillance video.

This type of testimony, based on Sergeant Knapp's personal knowledge, is
generally admissible, and is not expert opinion.[5] " '[T]he identity of a person is a proper

_____

[5] Sergeant Knapp did state that he based his opinion, in part, on the fact that he had been "doing this for 17 years and spending six years as an investigator myself in violent crimes." This fleeting reference to his experience did not transform his nonexpert testimony regarding his personal knowledge into expert testimony. Neither party attempted to qualify Knapp as an expert, and the trial court did not qualify him as an expert. To the extent defendant argues that defense counsel should have objected to Knapp's testimony because he was testifying as a de facto expert, "defendant cites no relevant authority for his assertion that a witness becomes a de facto expert simply because his or her personal observations may be partially informed by some professional training." (*People v. Jablonski* (2006) 37 Cal.4th 774, 823.)

Defendant does cite to *People v. Williams* (1992) 3 Cal.App.4th 1326, a case in which an officer based his opinion, in part, on his administration of a horizontal gaze nystagmus (HGN) test and his interpretation of the defendant's response to the test. (*Id.* at pp. 1332–1333.) The *Williams* court found that this was not proper lay opinion because the officer "drew a conclusion from the testing only because of his knowledge, training, and experience which was clearly beyond common experience." (*Id.* at p. 1333.) Defendant also refers to *People v. Chapple* (2006) 138 Cal.App.4th 540, a case in which the court held that whether a bulletproof vest is up to "standards" is not sufficiently within common experience to be identified at trial by lay witnesses. (*Id.* at pp. 547–549.) However, unlike bulletproof vests and interpreting a response to an HGN test, as discussed above, the identity of a person seen in a surveillance video is the proper subject of nonexpert opinion.

subject of nonexpert opinion ….' " (*People v. Leon* (2015) 61 Cal. 4th 569, 601.) "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid.*) It is not relevant to the issue of admissibility that Knapp did not have numerous prior contacts with defendant prior the robbery, because he was "familiar with defendant's appearance around the time of the crimes." (*Ibid.*). Additionally given that a crucial issue in this case was identity, that Knapp personally saw defendant the day the robbery occurred and was able to compare how defendant looked to the man in the surveillance video, Knapp's testimony aided the jury.[6]

Given that Sergeant Knapp had personal knowledge of defendant's appearance on the day of the robbery and that his testimony aided the jury in determining a crucial issue, defense counsel did not provide ineffective assistance by failing to object. (See *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1131 ["Ineffective assistance claims based upon

---

[6] We note that Sergeant Knapp also testified regarding the similarities between the clothing the perpetrator was seen wearing in the surveillance video and the clothing Knapp saw on the night of the incident. While the parties do not address this distinction, California courts have held admissible an officer's testimony offering a visual comparison of evidence where the points of similarity are obvious, such as comparing shoe prints at a crime scene with a defendant's shoes. (See *People v. Maglaya* (2003) 112 Cal.App.4th 1604, 1608–1609 [the trial court properly allowed an officer to give lay opinion as to similarities between the defendant's shoes and shoe prints at a crime scene]; *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1110–1111 [affirming the admissibility of an officer's lay opinion testimony comparing the soles of the defendant's shoes to a shoe print at the scene]; *People v. Taylor* (1935) 4 Cal.2d 495, 497 ["In those states where the subject has been considered, the trend of authority seems to be to the effect that by reason of the great practical differences between fingerprints and shoeprints, in that the shoeprints are so large and the points of similarity so obvious, the comparison of shoeprints is a matter of nonexpert rather than of expert testimony."].) Like shoe prints, the similarities commented upon by Knapp between the jersey and beanie depicted in the video and the jersey and beanie Knapp saw on the night of the robbery were "obvious" and thus a matter of nonexpert rather than of expert testimony. For the reasons described above, this testimony was also helpful to the jury.

17.

the failure to make evidentiary objections are routinely denied on the bases that the unasserted objection was nonmeritorious and would have been overruled …."].)

**B.** ***Even if There Was Error, There Was No Prejudice***

Defendant argues that defense counsel's failure to object to Sergeant Knapp testifying as to his experience and then stating that defendant committed robbery was error. He further contends the trial court instructing the jury that "witness certainty" was a valid factor in assessing A.C.'s credibility exacerbated the error. Even assuming error, our confidence in the verdict is not undermined because the purported error went to identity, and there was overwhelming evidence that defendant was the individual who robbed A.C. (*In re Gay* (2020) 8 Cal.5th 1059, 1087 ["How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the trial evidence on any decisive points. A 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' "].)

Even in the absence of the alleged errors, this is not a close case. The jury was shown surveillance videos, as well as photographs from the surveillance cameras. In the video, most of the perpetrator's face was visible, as was the gun that the perpetrator used. The jury was able to compare the face of the perpetrator from the video to a photograph of defendant's face that was taken on the day of the incident. The jury was also shown photographs of defendant's tattoos that were taken on the day of the incident and was able to view defendant's tattoos during the trial.

In addition to the above, the stolen smart watch was tracked to the house in southeast Fresno, and defendant was seen leaving this area shortly after the robbery occurred. Defendant left the area in a vehicle, which appeared to be the same vehicle that was seen in surveillance video from the convenience store. The red jersey that the perpetrator was seen wearing in the surveillance video was found near the location where defendant got into the vehicle. Additionally, an officer saw a man wearing a "red top" at

the house after defendant's brother, Robert, had already walked away. The beanie the perpetrator was seen wearing in the surveillance video was found near the vehicle defendant crashed. The surveillance video shows the perpetrator wearing black jeans and brown boot-like shoes, and defendant was arrested in black jeans and brown work boots. After defendant was arrested, an officer searched him, and defendant had an unopened package of cigarettes in his possession; the same brand of cigarettes that had just been taken from the convenience store. While the firearm was found in the ambulance that Robert was transported in, an officer who saw Robert and defendant in person on the day of the incident, as well as a photograph from the surveillance video, stated that defendant and Robert look "distinctly different," and that Robert was not the individual who committed the robbery.

Accordingly, there was an overwhelming amount of unchallenged evidence that defendant was the individual who committed the robbery.

As to the alleged error of failing to object to Sergeant Knapp's testimony that defendant committed robbery, defense counsel admitted that the man in the video committed robbery, and defendant does not argue that this strategy was an error. And Knapp's testimony that defendant was the man in the video was admissible lay opinion. Thus, it is not reasonably probable that, had Knapp's testimony that defendant committed robbery been excluded (or stricken), the result would have been different. As to Knapp's testimony regarding his experience prior to giving this testimony, the testimony regarding his experience was largely duplicative of testimony he previously provided. Thus, especially in light of the overwhelming evidence that defendant was the individual who committed the robbery, it is not reasonably probable that, had defense counsel objected and this testimony been excluded (or stricken), the result would have been different.

As to A.C.'s identification testimony, at trial A.C. testified that there was "no doubt" that defendant was the man who committed the robbery. The trial court provided the "certainty" paragraph of CALCRIM No. 315, which states that the jury should

19.

consider the following question: "How certain was the witness when he or she made an identification?"[7] Even if it was error for the trial court to have given this instruction, it was only one of 13 factors[8] provided by the trial court for the jury to consider. Moreover, while defendant argues there was prejudice because A.C.'s identification testimony was weak, the weakness in her testimony was not hidden from the jury. The jury was told more than once that A.C. was unable to identify defendant as the perpetrator during an infield lineup on the day of the robbery. Additionally, A.C. admitted that she did she did not get a look at the perpetrator's face when he got to the register or when he asked for cigarettes. When asked why she did not get a look at his face when he asked for cigarettes, A.C. responded "I usually don't make – I'm not the type of person to make eye contact with people." Finally, A.C. identified the perpetrator as having a mustache, but the man in the surveillance video did not have a mustache.

---

[7] In arguing that the "certainty" instruction should not have been given, defendant relies on *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). In *Lemke*, our Supreme Court discussed issues with the "certainty" instruction and referred "the matter to the Judicial Council of California and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id.* at p. 647.) Following this directive, the Judicial Council of California modified CALCRIM No. 315 to include additional instructions when an eyewitness testifies to certainty. The modified instruction was not given here.

However, defendant does not argue that failing to give the modified instruction rendered the trial fundamentally unfair, likely because the *Lemcke* court found that, "[w]hen considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair." (*Lemcke*, *supra*, 11 Cal.5th at p. 648.) Instead, defendant argues that giving the "certainty" instruction heightened the prejudice from Knapp's testimony. As discussed in this opinion, there was no prejudice to defendant.

[8] In this case, the trial court did not give all optional paragraphs of CALCRIM No. 315. The two omitted paragraphs related to whether the witness was able to identify other participants in the crime and whether the witness was able to identify defendant in a lineup.

Given that the jury was provided with information showing the weaknesses in A.C.'s identification testimony, as well as an overwhelming amount of other evidence showing that defendant was the individual who committed the robbery, there is not a reasonable probability that, had the trial court not given the "certainty" instruction, the result would have been different.

Overall, given the overwhelming evidence of defendant's guilt, the alleged errors do not undermine confidence in the verdict, and defendant has failed to show prejudice. As defendant did not show prejudice, defendant's claim of ineffective assistance of counsel fails.

### C.    *Defendant's Cumulative Errors Argument Fails*

While defendant's argument on the point is not clear, defendant appears to be arguing that the cumulative effect of the alleged errors requires reversal.  However, " '[w]e have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.' "  (*People v. Duong* (2020) 10 Cal.5th 36, 75; *People v. Westerfield* (2019) 6 Cal.5th 632, 728.)  Thus, this argument fails.

### DISPOSITION

As defendant's claim of ineffective assistance of counsel fails, the judgment of the trial court is affirmed.  The trial court is ordered to prepare an amended minute order and abstract of judgment correctly reflecting the trial court's judgment.  The amended minute order and amended abstract of judgment must reflect:  the determinate sentence of 14 years (comprised of a 10-year firearm enhancement on count 1, a four-year middle term sentence on count 3, and a stayed four-year term on count 2); and the indeterminate sentence of 25 years to life on count 1.  Additionally, the amended abstract of judgment should reflect the correct spelling of defendant's middle name:  Alvarez.  The trial court

21.

shall prepare and forward to all appropriate parties a certified copy of the amended abstract of judgment.


                                                             POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DESANTOS, J.

22.